**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| GEORGIA DEPARTMENT<br>OF COMMUNITY HEALTH<br>2 Peachtree Street, NW<br>Atlanta, GA 30303,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITED STATES DEPARTMENT<br>OF HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>CENTERS FOR MEDICARE<br>AND MEDICAID SERVICES<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>KATHLEEN SEBELIUS,<br>Secretary of the United States Department<br>of Health and Human Services, in her official capacity,<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>  and<br><br>MARILYN TAVENNER,<br>Administrator for the Centers for<br>Medicare and Medicaid Services, in her official capacity,<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civ. No.  1:13-cv-1281 |

**COMPLAINT**

## INTRODUCTION

1.      The Medicaid program is "a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons." *Harris v. McRae*, 448 U.S. 297, 308 (1980).  This "system of 'cooperative federalism,'" *id.* (quoting *King v. Smith*, 392 U.S. 309, 316 (1968)), establishes a "set of intricate, ongoing relationships between the States and the Federal Government." *Bowen v. Massachusetts*, 487 U.S. 879, 900 n.31 (1988).  This relationship between the States and the Federal Government "involve[s] constantly shifting balance sheets," *id.* at 904 n.39, and "adjustments in the open account between the parties," *id.* at 893.

2.      In this case, the Georgia Department of Community Health ("Department," "Georgia," or "State"), the state agency responsible for administering the Medicaid program in the State of Georgia, seeks restitution of over $90 million in state funds that the Department inadvertently and erroneously credited to Defendant the Centers for Medicare and Medicaid Services ("CMS"), the federal agency immediately responsible for overseeing the Medicaid program at the federal level, in 2005 and 2006.

3.      Defendants have not disputed that the funds were credited to the federal government by mistake.  Nor have they disputed that the federal government was not entitled to the funds in the first place.  Defendants nevertheless have refused to reverse the credits, claiming that the State's request for their return was time-barred.  CMS disallowed Georgia's effort to recover the mistakenly credited funds on this basis, and the United States Department of Health and Human Services ("HHS") Departmental Appeals Board ("Board") upheld the disallowance.  A copy of the Board's decision is attached hereto as Exhibit A.

4. CMS's refusal to return the erroneously credited funds is inconsistent with the terms of the Medicaid statute, with CMS's own regulations, and with equity and justice. The Board's affirmance of the disallowance is arbitrary, capricious, an abuse of discretion, and contrary to law. Furthermore, Defendants' actions result in unjust enrichment of the federal government at Georgia's expense, amounting to a betrayal of the federal-state partnership on which the Medicaid program is founded.

5. The Court should set aside the Board's decision and the underlying disallowance and require Defendants to reverse the erroneous credits. Alternatively, the Court should order restitution of the $90,050,230 that Georgia inadvertently credited to Defendants, thereby restoring the funds to their rightful owner and ending the unjust enrichment of the federal government at the expense of the State.

## JURISDICTION AND VENUE

6. This action arises under Section 1116 of the Social Security Act, 42 U.S.C. § 1316(e)(2)(C), Section 10 of the Administrative Procedure Act, 5 U.S.C. § 704, and federal common law. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

7. Venue is proper under 28 U.S.C. § 1391(e)(1) and 42 U.S.C. § 1316(e)(2)(C).

8. There presently exists an actual controversy between Georgia and the Defendants requiring resolution by this Court.

## PARTIES

9. Plaintiff Georgia Department of Community Health ("Department," "Georgia," or "State") is the "single State agency" responsible for administration of the State of Georgia's participation in the federal Medicaid program. *See* 42 U.S.C. § 1396a(a)(5).

10. Defendant United States Department of Health and Human Services ("HHS") is the federal agency responsible for administering the Medicaid program.

11. Defendant Centers for Medicare and Medicaid Services ("CMS") is the agency within HHS immediately responsible for overseeing the Medicaid program at the federal level.

12. Defendant Kathleen Sebelius is the Secretary of HHS and is responsible for the overall administration of the agency. She is sued in her official capacity.

13. Defendant Marilyn Tavenner is the Administrator for CMS and is responsible for overseeing the agency. She is sued in her official capacity.

## STATUTORY AND REGULATORY BACKGROUND

**The Medicaid Program and Medicaid Funding**

14. Medicaid is a cooperative federal-state program under which the federal government provides financial assistance to participating States in connection with the provision of health care to lower-income individuals and families. Under the federal Medicaid statute (Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*), States are entitled to reimbursement for a specified percentage of the actual costs they incur in providing health care to their Medicaid-eligible populations. *See id.* § 1396b(a).

15. A State participating in the Medicaid program must obtain CMS's approval of a state plan for medical assistance. *See id.* § 1396a. The State receives federal reimbursement for its expenditures on medical assistance under its state plan. *See id.* § 1396b.

16. The federal government's share of a State's expenditures under the Medicaid program is called "federal financial participation" ("FFP"). 42 C.F.R. § 400.203; 45 C.F.R. § 95.4.

17. The federal Medicaid statute and related regulations establish the procedures by which States receive FFP for their Medicaid expenditures.

18. At least 45 days before the beginning of each fiscal quarter, the State must submit to the Secretary of HHS a Form CMS-37 ("Medicaid Program Budget Report; Quarterly Distribution of Funding Requirements"). The Form CMS-37 contains a financial report with the State's estimate of its anticipated Medicaid expenditures for the upcoming quarter. *See* 42 U.S.C. § 1396b(d)(1); 42 C.F.R. § 430.30(b).

19. Based on the State's Form CMS-37, the Secretary estimates the amount of FFP to which the State will be entitled for the upcoming quarter. *See* 42 U.S.C. § 1396b(d)(1); 42 C.F.R. § 430.30(a). The Secretary then awards the State a grant in the appropriate amount, which authorizes the State to draw down funds as needed to pay the federal share of the State's disbursements for provision of medical assistance. *See* 42 C.F.R. §§ 430.30(a), (d)(3). The State draws the funds against a continuing letter of credit certified to the Secretary of the Treasury in favor of the State. *See id.* § 430.30(d)(4).

20. Within 30 days after the end of each quarter, the State submits a Form CMS-64 ("Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program"). *See id.* § 430.30(c)(1). On the Form CMS-64, the State reports its accounting of its actual recorded expenditures for the quarter. *See id.* § 430.30(c)(2). Form CMS-64 is also the vehicle for making adjustments for any identified overpayment or underpayment to the State. *See* CMS, State Medicaid Manual § 2500(A).

21. The State reconciles the anticipated expenditures reported on Form CMS-37 with the actual expenditures reported on Form CMS-64 by crediting the federal government with the amount of federal funds the State requested but did not use for the quarter. *See* 42 U.S.C. § 1396(d)(2)(A).

22.     A State may report expenditures on a Form CMS-64 for a quarter after the quarter in which the State incurs the expenditures (for example, when providers of medical assistance do not submit their claims to the State until after the end of the quarter in which they furnished the covered services).  These prior period adjustments are, in effect, reimbursement claims for earlier expenditures.

**Provider Overpayments**

23.     An "overpayment" occurs when a State makes a payment to a Medicaid provider (e.g., a hospital or physician) in an amount greater than the amount that is allowable under the terms of the state plan approved by CMS.  Overpayments are ineligible for FFP.

24.     When a State has claimed FFP for a provider payment that the State later discovers to be an overpayment, the Medicaid statute and CMS regulations generally require the State to credit the federal government in the amount of the federal share of the overpayment—even if the State has not yet recovered the overpayment from the provider.  *See* 42 C.F.R. § 433.312(a).

25.     At the time of the events giving rise to this case, Section 1903(d)(2)(C) of the Social Security Act allowed States only "60 days from the date of discovery of an overpayment to a provider to recover or seek to recover the overpayment before the Federal share must be refunded to CMS."  42 U.S.C. § 1396b(d)(2)(C) (2009); *see also* 42 C.F.R. §§ 433.302, 433.312(a) (2009).

26.     Once 60 days elapsed following the "discovery" of an overpayment, CMS regulations required the State to refund the federal share of the overpayment by entering "a credit on its [Form CMS-64] . . . for the quarter in which the 60-day period following discovery . . . ends." 42 C.F.R. §§ 433.320(a)(2), (b) (2009); *see also* 42 U.S.C. § 1396b(d)(2)(C) (2009).

27.     If "after the [State] . . . credited CMS with the Federal share" the State discovered that the credit was no longer appropriate, the State could "reclaim the amount of the downward

– 6 –

adjustment [to the overpayments previously refunded] on the Form CMS-64." 42 C.F.R. § 433.320(c) (2009); *see also id.* § 433.320(h)(5).

**Two-Year Deadline for Claiming Federal Reimbursement for Expenditures**

28.     Under Section 1132(a) of the Social Security Act, "any claim by a State for payment with respect to an expenditure made during any calendar quarter by the State" must be filed "within the two-year period which begins on the first day of the calendar quarter immediately following such calendar quarter." 42 U.S.C. § 1320b-2(a). Federal reimbursement is generally not available if a State's claim for reimbursement is "not made within such two-year period." 42 U.S.C. § 1320b-2(a).

29.     HHS has promulgated regulations pursuant to Section 1132(a). *See* 45 C.F.R. §§ 95.1–.34. These regulations refer to "a two year time limit . . . for a State to claim Federal financial participation in expenditures under [approved Medicaid] State plans." *Id.* § 95.1(a). In the normal course, CMS will reimburse a State for an expenditure claimed on a Form CMS-64 "only if the State files a claim with us for that expenditure within 2 years after the calendar quarter in which the State agency made the expenditure." *Id.* § 95.7.

30.     The regulations define "claim" as "a request for Federal financial participation in the manner and format required by [Medicaid] program regulations, and instructions or directives issued thereunder." "Federal financial participation" is in turn defined as "the Federal government's share of an expenditure made by a State agency under [the Medicaid program]." *See* 45 C.F.R. § 95.4; *see also* 42 C.F.R. § 400.203.

31.     CMS regulations further provide that "[i]f the amount of an overpayment is adjusted downward after the agency has credited CMS with the Federal share, the agency may reclaim the amount of the downward adjustment on the Form CMS-64." 42 C.F.R. § 433.320(c). Under this provision, "[t]he 2-year filing limit for retroactive claims for Medicaid expenditures does not

apply. A downward adjustment is not considered a retroactive claim but rather a reclaiming of costs previously claimed." *Id.* § 433.320(c)(2).

## FACTUAL BACKGROUND

**Georgia's Process for Reporting and Refunding 60-Day Provider Receivables**

32. Georgia relies on its Medicaid Management Information System to process Medicaid provider claims, track provider receivables, and generate reports regarding provider receivables more than 60 days old for Georgia's quarterly Form CMS-64 filings.

33. In early 2003, the vendor for Georgia's Medicaid Management Information System launched a new computer system for processing the claims of Medicaid providers. Serious flaws with the new system caused significant delays in processing and paying provider claims. Medicaid providers strenuously complained that they could not operate without receiving timely payment.

34. To respond to this crisis, Georgia consulted with CMS and began making advance payments to Medicaid providers based on the providers' prior Medicaid claims history. The State subsequently reconciled its advance payments to providers with the providers' actual claims for the items and services the providers furnished to Medicaid beneficiaries. CMS staff agreed with Georgia that this was a reasonable step to take in light of the failure of the vendor's claims processing system.

35. For internal accounting purposes, Georgia treated its advance payments to providers as "provider receivables." As Georgia received and processed providers' actual claims, the State applied the claims against the provider receivables account.

36. On the Form CMS-64 that Georgia submitted at the end of each quarter, the State reported the payments it had advanced to providers in that quarter as "Expenditures In This Quarter."

37. Georgia treated any advance payment that had not yet been reconciled with actual claims within 60 days ("60-day provider receivables") as an overpayment. Pursuant to Section 1903(d)(2)(C) of the Social Security Act, Georgia credited the federal share of these overpayments to CMS on its Form CMS-64.

38. When Georgia received and reconciled provider claims after the 60-day period for making overpayment adjustments, Georgia reported the reconciled amounts on its Form CMS-64, thereby reclaiming the amounts of the previously credited overpayments.

39. Throughout this period, CMS never questioned the State's handling or reporting of the advance payments, credits for overpayments, or recovered amounts.

**Georgia Inadvertently Credits Over $90 Million to CMS**

40. By June 30, 2005, the cumulative balance for 60-day provider receivables in Georgia's provider receivables account was over $60 million. The substantial size of the 60-day provider receivables balance was due largely to the high volume of advance payments made to providers following the 2003 failure of Georgia's claims processing system.

41. Of this amount, $37,402,375.33 represented the cumulative balance of the federal share of the 60-day provider receivables that the Department had already credited to CMS on a quarterly basis from 1989 to June 30, 2005, netted against the adjustments due to later recoveries from providers.

42. Georgia's provider receivables account as of June 30, 2005, also included another $7,622,739.76, representing the federal share of other provider receivables, including provider receivables that were less than 60 days old and therefore not yet overpayments due for a refund to CMS. Some of these receivables would have been eliminated later as provider claims were received, and any of the receivables that eventually exceeded 60 days would have been reported on the Form CMS-64 in the normal course.

43. Department staff recorded the total of $45,025,115.09 ($37,402,375.33 plus $7,622,739.76) as a liability to the federal government on the Department's financial statement for State fiscal year 2005.

44. In taking steps to record the $45,025,115 figure on the Department's financial statement for State fiscal year 2005, Department staff created documentation that unintentionally caused this figure to flow through to the Form CMS-64 for the quarter ended September 30, 2005 as a credit to CMS.  Because most of the $45,025,115 was a cumulative balance that reflected amounts Georgia had already refunded to CMS in past quarters, the State should not have included that amount as a credit on its Form CMS-64 for the quarter ended September 30, 2005.  Georgia's inclusion of that amount in effect erroneously credited the 60-day provider receivables to CMS a second time.  In addition, there was no reason to credit CMS for receivables that were less than 60 days old as of June 30, 2005.

45. At the end of State fiscal year 2006, Georgia again mistakenly credited CMS with $45,025,115.  This occurred when Department staff created documentation in an attempt to delete the earlier $45,025,115 entry from the State's internal accounting system so that staff could enter an updated cumulative balance of provider receivables on the financial statement for State fiscal year 2006.  This transaction flowed through the accounting system in a way that caused the $45,025,115 to be included again as a credit to CMS, this time on Georgia's Form CMS-64 for the quarter ended June 30, 2006.

46. The two erroneous entries of $45,025,115 in 2005 and 2006 resulted in Georgia crediting to CMS a total of $90,050,230 that was not owed to CMS.

**Georgia Requests that CMS Return the Erroneously Credited Funds**

47. Georgia did not discover that it had erroneously credited over $90 million to CMS until 2008, when the Department conducted an intensive internal review of its financial records

and CMS-64 forms for previous quarters. The Department initiated the review of its records for prior years in an effort to reconcile amounts reflected in the financial statements after the Department's external auditors concluded that certain amounts appearing on the statements lacked adequate support.

48. During this internal review, Georgia discovered the two erroneous credits to CMS. At that point the State realized that it had credited $90,050,230 in funds to which CMS was not entitled.

49. Georgia initially attempted to recover the $90,050,230 by reporting this amount as an adjustment on its Form CMS-64 for the quarter ended March 31, 2009. Georgia subsequently removed this adjustment from its Form CMS-64 for the quarter ended March 31, 2009 because it identified a numerical error in the entry.

50. Georgia again attempted to recover the erroneous credits by making an entry on its Form CMS-64 for the quarter ended June 30, 2009. The State entered $90,050,230 in the Form CMS-64 field for "other expenditures" attributable to prior period adjustments for inpatient hospital services based on Department staff's belief that the bulk of the erroneous credits related to previously credited overpayments for inpatient hospital services.

51. Georgia explained the nature of its request on the front page of its Form CMS-64 for the quarter ended June 30, 2009: "A significant adjustment of approximately $90M is being claimed in this quarter. The basis is as an adjustment to 60 day receivables." This statement informed CMS that the $90,050,230 adjustment was not in fact a claim for FFP for state expenditures.

**CMS Refuses to Reverse the Erroneous Credits**

52. On December 11, 2009, the Acting Associate Regional Administrator of CMS's Division of Medicaid and Children's Health Programs (Region IV-Atlanta) deferred Georgia's

request that CMS make the requested adjustment to reverse the erroneous credits and thereby return the $90,050,230 that Georgia had erroneously credited to CMS.  The Acting Associate Regional Administrator asserted that "[t]he deferred amount represents expenditures claimed as a correction of an error made in 2005."  According to the Acting Associate Regional Administrator, Georgia's effort to recover the erroneously credited funds was therefore "not allowable according to Section 1132(a) of the Social Security Act that requires a claim for FFP to be filed within a two-year period."

53. In a response sent on February 5, 2010, Georgia disputed the Acting Associate Regional Administrator's characterization of Georgia's request that CMS return the erroneously credited funds and contested the applicability of Section 1132(a).  Georgia explained that the $90,050,230 entry "represents reclaiming overpayment amounts previously refunded to CMS" and that therefore, "as stated in [42 C.F.R. § 433.320(c)(2)], '[t]he 2-year filing limit for retroactive claims for Medicaid expenditures does not apply.'"

54. In a subsequent letter, Georgia further explained that its request was not a claim for "expenditures" at all.  Georgia reiterated that "[t]he amount claimed does not represent a claim for inpatient hospital services that w[as] not previously submitted" and that the two-year claiming limitation was therefore inapplicable.

55. On June 30, 2011, the new Associate Regional Administrator of CMS's Division of Medicaid and Children's Health Programs (Region IV-Atlanta) disallowed Georgia's request for an adjustment that would reverse the erroneous credits and restore the erroneously credited funds to the State.  In the disallowance letter, the Associate Regional Administrator maintained that Georgia's request that CMS return the erroneously credited funds was a "time-barred" claim for

FFP. The letter from the Associate Regional Administrator stated that this was CMS's "final decision."

**Departmental Appeals Board Proceedings**

56. Georgia timely appealed the disallowance to the HHS Departmental Appeals Board. Georgia explained to the Board that the two-year deadline for claiming FFP for expenditures does not apply to the State's request that CMS return the erroneously credited funds and that the State was not seeking federal reimbursement for any expenditure. Alternatively, Georgia argued that the State's request was a downward adjustment of provider overpayments previously refunded to CMS and that under 42 C.F.R. § 433.320(c), the two-year claiming deadline was therefore inapplicable. Third, Georgia argued that CMS has no legal authority to retain the erroneously credited funds, while Georgia has a right to recover them.

57. In its Decision No. 2521, issued on June 28, 2013, the Board sustained the $90,050,230 disallowance in its entirety. First, the Board concluded that Georgia's request that CMS return the $90,050,230 in erroneous credits was a "claim" for FFP subject to the two-year claiming deadline. *See* Exhibit A at 9–15. Second, the Board rejected Georgia's alternative argument that its request for a reversal of the credits was exempt from the two-year limit under CMS's provider overpayment regulations. *See id.* at 15–19. Third, the Board concluded that it "has no authority" to entertain Georgia's arguments based on "general equitable principles, such as prevention of unjust enrichment." *See id.* at 22.

### COUNT I

**(Administrative Procedure Act: Violation of the Medicaid Statute and Regulations and Arbitrary and Capricious Agency Action – Against Defendants HHS and Sebelius Only)**

58. Paragraphs 1 through 57 above are incorporated herein by reference.

59. The disallowance of Georgia's request that CMS return $90,050,230 that Georgia erroneously credited to CMS and the Board's affirmance of the disallowance were arbitrary and capricious, an abuse of discretion, and contrary to law.

## COUNT II

### (Money Had and Received – Against All Defendants)

60. Paragraphs 1 through 59 above are incorporated herein by reference.

61. Defendants have received $90,050,230 in funds belonging to Georgia as a result of the erroneous credits entered on Georgia's CMS-64 forms for the quarters ended September 30, 2005 and June 30, 2006.

62. Georgia demanded that Defendants return the funds by reversing the erroneous credits, and reasonably expected their return.

63. Defendants refused Georgia's demand that the credits be reversed and the funds be returned.

64. Defendants have no right in equity or good conscience to retain the $90,050,230 that Georgia erroneously credited to CMS.

## COUNT III

### (Unjust Enrichment – Against All Defendants)

65. Paragraphs 1 through 64 above are incorporated herein by reference.

66. By erroneously crediting CMS with $90,050,230, Georgia conferred a benefit upon Defendants to which they were not entitled.

67. Georgia demanded that Defendants reverse the credits and return the funds, and reasonably expected their return.

68. Defendants refused Georgia's demand that the credits be reversed and the funds be returned.

69. In justice and equity, the funds in question belong to Georgia, and Defendants have no right to retain the funds.

70. By declining to reverse the erroneous credits and thereby retaining the State's funds to which they are not entitled, Defendants have been unjustly enriched at Georgia's expense.

## REQUEST FOR RELIEF

WHEREFORE, Georgia requests that this Court grant the following relief:

A. Set aside HHS Departmental Appeals Board Decision No. 2521 and the underlying disallowance upheld by that decision;

B. Permanently enjoin Defendants and their agents, employees, successors in office, and all persons acting in concert or participation with them, from failing or refusing to return to Georgia the inadvertently credited $90,050,230;

C. Order restitution of the $90,050,230 in funds that Georgia inadvertently credited to CMS and that Defendants have unjustly retained;

D. Award Georgia such declaratory and other relief as may be just and proper;

E. Award Georgia the costs of this action, including attorneys' fees; and

F. Retain jurisdiction over this action for such additional and supplemental relief as may be required to enforce the order and judgment.

Respectfully submitted,

/s/ Caroline M. Brown
Caroline M. Brown (D.C. Bar No. 438342)
Carolyn F. Corwin (D.C. Bar No. 939355)
Matthew J. Berns (D.C. Bar No. 998094)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Tel: (202) 662-6000
Fax: (202) 662-6291
cbrown@cov.com

Samuel S. Olens (Georgia Bar No. 551540)
ATTORNEY GENERAL OF GEORGIA
Dennis R. Dunn (Georgia Bar No. 234098)
DEPUTY ATTORNEY GENERAL OF GEORGIA
40 Capitol Square, SW
Atlanta, GA 30334
Tel.: (404) 656-3300
Fax: (404) 657-8733

August 23, 2013

*Attorneys for Plaintiff*
*Georgia Department of Community Health*