UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GEORGIA DEPARTMENT OF COMMUNITY HEALTH, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :   Civil Action No. 13-1281 (GK) |
| | : |
| UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, et al., | : |
| | : |
| Defendants. | : |

### MEMORANDUM OPINION

Plaintiff Georgia Department of Community Health ("Georgia") brings this suit against Defendants United States Department of Health and Human Services ("HHS"), Centers for Medicare & Medicaid Services ("CMS"), Kathleen Sebelius, in her official capacity as Secretary of HHS, and Marilyn Tavenner, in her official capacity as Administrator for CMS (collectively, "Defendants."), to recover $90,050,230 that Georgia erroneously credited to CMS in 2005 and 2006.

This matter is before the Court on Cross-Motions for Summary Judgment [Dkt. Nos. 13 & 14]. Upon consideration of the Motions, Oppositions [Dkt. Nos. 15 & 16], Replies [Dkt. Nos. 18 & 19], the entire record herein, and for the reasons stated below, Plaintiff's Motion for Summary Judgment is **granted in**

**part and denied in part** and Defendants' Cross-Motion for Summary Judgment is **granted in part and denied in part**.

I.   **BACKGROUND**

    A.   **Statutory Background**

        1.   **Medicaid Expenditures**

Title XIX of the Social Security Act ("SSA"), commonly referred to as Medicaid, is a cooperative federal-state program that provides medical assistance to low-income families and individuals. 42 U.S.C. § 1396 et seq. The program is administered by the states and overseen by CMS. See id.; 42 C.F.R. § 430.0. If certain requirements are met, a state is eligible to receive federal funds for a percentage of its Medicaid program expenditures. 42 U.S.C. § 1396(a). The bulk of a state's Medicaid expenditures consist of payments to medical providers for health care services provided to program beneficiaries. 42 C.F.R. § 430.0.

The federal portion of the funds -- "Federal financial participation" ("FFP") -- is paid to the states on a quarterly basis. See 42 U.S.C. § 1396b(a). Forty-five days before the start of each quarter, the state submits a form CMS-37, which contains the state's estimated Medicaid funding expenses for the upcoming quarter. 42 C.F.R. 430.30(b). The federal government, through CMS, provides the state with a "grant award," which is

-2-

similar to a line of credit. The grant award authorizes the state to draw federal funds as needed over the course of the quarter to pay the federal share of the state's Medicaid disbursements. Id. at 430.30(d).

Within 30 days after the end of the quarter, the state must submit to CMS a Quarterly Statement of Expenditures ("QSE"), also known as a form CMS-64. Id. at § 430.30(c)(1). Unlike the CMS-37, which contains predicted expenditures, the QSE is an "accounting of actual recorded expenditures" for the quarter. Id. at § 430.30(c)(2). The QSE details and reconciles how the federal grant award monies were spent.

In addition to the most recent quarter's expenditures, the QSE contains several entries for "increasing" or "decreasing" adjustments to claims from prior quarters. Such adjustments are necessary because, for a number of reasons, a state is not always able to present a complete, accurate, or otherwise final accounting within 30-days of the end of the most recent quarter. In such circumstances, a state uses a later quarter's QSE to adjust retroactively, either up or down, expenditure amounts reported in the earlier quarter's QSE or the federal share claimed with respect to those expenditures. 42 U.S.C. 1396b(d).

### 2.     Two-year Limitations Period

Section 1132 of the SSA (codified at 42 U.S.C. § 1320b-2(a)) provides for a two-year window during which states are permitted to file claims for expenditures. The Secretary of HHS has also issued implementing Regulations. See 45 C.F.R. §§ 95.1-.34. They state that "[CMS] will pay a State for a State agency expenditure . . . only if the State files a claim with [CMS] for that expenditure within 2 years after the calendar quarter in which the State agency made the expenditure." Id. § 95.7. Claims made for expenditures after the two-year period has expired are "disallowed" and not paid.

There are exceptions to the two-year period for court-ordered retroactive payments, audit exceptions, and adjustments to prior year costs, 42 U.S.C. § 1320b-2(a), as well as "[a]ny claim for which the Secretary decides there was good cause." 45 C.F.R. § 95.19. "[N]eglect or administrative inadequacy" on the part of a state does not constitute good cause. 45 C.F.R. § 95.22.

### 3.     Overpayments

An "overpayment" is defined as "the amount paid by a Medicaid agency to a provider which is in excess of the amount that is allowable for services furnished . . . and which is required to be refunded . . . ." 42 C.F.R. § 433.304. Stated

-4-

differently, an overpayment is a payment by a state to a medical provider that is impermissible and therefore not eligible for FFP under the state's Medicaid plan.

When a state has claimed FFP for a medical provider payment that is later determined to constitute an overpayment, the state must return to CMS the federal share of the amount overpaid. The state has sixty days[1] in which to return the federal share of the overpayment to CMS, regardless of whether the state has recovered the overpayment from the medical provider. See 42 C.F.R. 433.312. The return of an overpayment is effectuated by listing the credit in the QSE (line 10.C). See 42 C.F.R. § 433.320. This is considered a "decreasing adjustment."

If, after a state has credited CMS with the federal share of an overpayment, that overpayment is later adjusted downward, the state may reclaim the amount of the downward adjustment on the next QSE. 42 C.F.R. § 433.320(c). In other words, if the state later realizes that the amount it overpaid a medical provider is less than it previously thought, and that it therefore over-credited CMS, it may reclaim the appropriate portion of the credit. The two-year filing limit does not apply

---

[1] When the events at issue in this case occurred, the period of time to return the federal share to CMS was 60 days from the date of discovery of the overpayment. The statute has since been modified so that the period is now one year.

to downward adjustments of overpayments, as the "downward adjustment is not considered a retroactive claim but rather a reclaiming of costs previously claimed." Id.

###   B.   Factual Background

The parties have no disagreement about the facts that led to Georgia's inadvertent credit of $90,050,230 to CMS and CMS's subsequent refusal to refund the money. In 2003, Georgia launched a new Medicaid Management Information System ("MMIS") to process claims submitted by providers. Georgia Dep't of Cmty. Health, HHS Departmental Appeals Board ("DAB" or "the Board") No. 2521, 5-6 (Jun. 28, 2013) [hereinafter DAB No. 2521]. The new system suffered from severe problems that resulted in significant delays in paying providers. Georgia received numerous complaints from providers that they could not continue to operate without payment. Id.

In response to this crisis and to ensure the availability of medical services for Georgia's Medicaid recipients, Georgia proposed, and CMS agreed, that until the MMIS issues were resolved, Georgia could make "advance" payments to providers prior to the submission and processing of payment claims for the services. Id. at 6. It was understood that the advance payments would later be matched and reconciled with actual payment claims once MMIS could process them. Between April 1, 2003, and

-6-

June 30, 2005, Georgia made approximately $2 billion in advance payments to providers under this arrangement. Id.

For its own internal accounting purposes, Georgia classified the advance payments as "provider receivables" (i.e. money to be recouped from Medicaid providers). For purposes of the QSE, Georgia reported the advance payments as current-quarter expenditures. DAB No. 2521 at 6; Georgia Mot. at 7.

Advance payments that were not matched and reconciled with provider claims within 60 days were treated as overpayments. Just as with standard overpayments, Georgia had to refund the federal share of the advance payments to CMS after 60 days. The refund to CMS was listed as a decreasing adjustment on line 10.C of the QSE (along with any other overpayments unrelated to Georgia's MMIS problems). DAB No. 2521 at 6.

If, after Georgia had refunded the federal share to CMS, the advance payments were reconciled with medical provider claims, Georgia would report the reconciled amounts as "other" expenditures on its current-quarter QSE. Id. This procedure allowed Georgia to receive payment for the federal share of the reconciled expenditures, which it had previously and erroneously refunded back to CMS. This procedure was also consistent with how Georgia routinely reported reconciliations of the routine 60-day provider receivables. Dubberly Decl. ¶ 8.

-7-

In 2005, Georgia decided to include the federal share of its provider receivables balance -- $45,025,115.09 -- as a liability on its financial statement for State fiscal year ("SFY") 2005. DAB No. 2521 at 6. Of this amount, $37,402,375.33 represented the federal share of provider receivables that had already been refunded to CMS (as required) as decreasing adjustments on QSEs submitted between 1989 and June 2005. The majority of the $37.4 million related to refunds to CMS of advance payments made between 2003 and 2005 in response to Georgia's MMIS problems. Id. The remaining $7,622,739.76 represented provider receivables that were less than 60 days old and for which there was not yet any obligation to refund the federal share. Id. at 7.

In the process of preparing its SFY 2005 statements, Georgia inadvertently included the $45,025,115.09 ("$45 million") provider receivables balance in its decreasing adjustment on the QSE for the quarter ended September 30, 2005 ("September 2005 QSE"). Id. This mistake had the effect of re-crediting to CMS $37.4 million that had been previously credited from 1989 to June 2005. It was also premature to credit the $7.6

−8−

million to CMS, as the receivables were less than 60 days old.[2] Georgia Mot. at 9.

While preparing its financial statements for SFY 2006, Georgia again inadvertently credited the $45 million to CMS, this time on the QSE for the quarter ended June 30, 2006 ("June 2006 QSE"). Georgia Mot. at 9; DAB No. 2521 at 7-8.

Combined, Georgia erroneously credited CMS $90,050,230 between 2005 and 2006 ("$90 million"). Georgia did not realize its errors until 2008, when issues identified by its external auditor triggered an in-depth internal review of its financial records and prior QSEs. DAB No. 2521 at 8. It was during this review that Georgia discovered the two $45 million credits it had made to CMS.

### C.   Procedural Background

Once Georgia discovered the errors, it attempted to reclaim the $90 million by including the amount on the "other" expenditures line of the QSE for the quarter ended June 30, 2009 ("June 2009 QSE"). Id. Georgia included a "footnote" on the first page of the QSE stating that a "significant adjustment of

---

[2] To the extent those receivables remained outstanding after 60 days, they would have been credited on later QSEs as required; if they were reconciled, Georgia would not have had to repay the federal share. Georgia Mot. at 9.

approximately $90M is being claimed this quarter. The basis is as an adjustment to 60 day receivables." AR 410 [Dkt. No. 20-1].

On December 11, 2009, CMS deferred[3] Georgia's claim for the $90 million, asserting that Georgia's request was untimely. AR 416-17. Georgia responded to the deferral with two separate letters, arguing why the two-year limitation was not applicable in this circumstance. AR 420-28.

On June 30, 2011, CMS notified Georgia that it was disallowing the $90 million adjustment. DAB No. 2521 at 8. CMS acknowledged that Georgia was attempting to reverse the two inadvertent $45 million payments, and did not dispute that they were erroneous, but concluded that the request should be disallowed "because it was submitted more than two years after the quarter in which 'the original State payment was made." Id. (citing June 30, 2011 Letter from CMS to Georgia, AR 431-32).

Georgia appealed CMS's decision to the Board. After the parties submitted their briefs, the Board heard oral argument, and on February 8, 2013, issued a "Preliminary Analysis" rejecting the arguments of both parties and setting forth its view of the case. DAB No. 2521 at 9. Both parties then submitted

---

[3] CMS may issue a "deferral," or temporary withholding of FFP, if the CMS Administrator "questions [the] allowability [of a claim] and needs additional information to resolve the question." 42 C.F.R. § 430.40.

-10-

written comments to the Preliminary Analysis. Id. On June 28, 2013, the Board sustained the entire $90 million disallowance. See generally DAB No. 2521.

Georgia filed its Complaint with the Court on August 23, 2013 [Dkt. No. 1]. It then filed its Motion for Summary Judgment ("Georgia's Mot.") [Dkt. No. 13] on March 4, 2014. Defendants filed their Cross-Motion for Summary Judgment and Combined Opposition to Georgia's Motion ("Defs.' Mot.") [Dkt. No. 14] on May 5, 2014. On June 4, 2014, Georgia filed its Combined Opposition to Defendants' Cross-Motion and Reply in Support of Plaintiff's Motion ("Georgia's Reply") [Dkt. No. 17]. On July 7, 2014, Defendants filed their Reply in Support of Defendants' Cross-Motion ("Defs.' Reply") [Dkt. No. 19].

## II.   **STANDARD OF REVIEW**

The Administrative Procedure Act ("APA") requires a court to hold an agency action unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The arbitrary and capricious standard of the APA is a narrow standard of review. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

It is well established in our Circuit that the "court's review is  .  .  . highly deferential" and "we are 'not to

-11-

substitute [our] judgment for that of the agency' but must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Bloch v. Powell, 348 F.3d 1060, 1070 (D.C. Cir. 2003) (quoting S. Co. Servs., Inc. v. FCC, 313 F.3d 574, 579-80 (D.C. Cir. 2002)); see also United States v. Paddack, 825 F.2d 504, 514 (D.C. Cir. 1987). However, this deferential standard cannot permit courts "merely to rubber stamp agency actions," Natural Res. Def. Council v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000), nor be used to shield the agency's decision from undergoing a "thorough, probing, in-depth review." Midtec Paper Corp. v. United States, 857 F.2d 1487, 1499 (D.C. Cir. 1988) (internal citations and quotations omitted).

An agency satisfies the arbitrary and capricious standard if it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)); Lichoulas v. Fed. Energy Regulatory Comm'n, 606 F.3d 769, 775 (D.C. Cir. 2010). Finally, courts "do not defer to [an] agency's conclusory or unsupported

-12-

suppositions." McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1186-87 (D.C. Cir. 2004).

Summary judgment will be granted when there is no genuine issue as to any material fact. See Fed. R. Civ. P. 56(c). Because this case involves a challenge to a final agency decision, the Court's review on summary judgment is limited to the Administrative Record. Holy Land Found. for Relief and Dev. v. Ashcroft, 333 F.3d 156, 160 (D.C. Cir. 2003) (citing Camp v. Pitts, 411 U.S. 138, 142 (1973)); Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record.").

## III. ANALYSIS

### A.   The Board Decision

#### 1.   The $90 Million Request Is a Claim Subject to the Claiming Limit

Under SSA § 1132, states must file claims for expenditures with CMS within a two-year period. See supra, Section I.A.2; 42 U.S.C. § 1320b-2(a); see also 45 C.F.R. § 95.7. The Regulations define a "claim" as a "request for Federal financial participation," 45 C.F.R. § 95.4, where "Federal financial participation" is "the Federal government's share of an

—13—

expenditure made by a State agency." Id. Therefore, a claim is a request for the Federal government's share of an expenditure. "Expenditure" is not explicitly defined in the Regulations.

Georgia argues that this two-year limit is inapplicable because its request for $90 million is neither a "claim" nor a request made "with respect to an expenditure." Georgia Mot. at 15. Instead, Georgia describes its request as one for the recovery of state funds inadvertently credited to CMS. If CMS were to pay it $90 million, Georgia argues, it would not be on account of any "expenditures" by the State, but in order to remedy a bookkeeping error. Id. at 15-16.

In further support of its argument, Georgia notes that it had already timely claimed and received FFP with respect to the 1988-2005 expenditures underlying the erroneous credits. Because it had already been paid for the expenditures, Georgia states that it was not seeking reimbursement for those expenditures, only repayment of the inadvertent re-crediting to CMS.

The Board disagreed with Georgia, finding the $90 million request to be a claim and therefore subject to the two-year limitation. The Board stated that the two-year limitation "expressly covers 'any' request for federal funding 'with respect to' a state's expenditures." DAB No. 2521 at 10. Accordingly, under the Board's reasoning, if Georgia's $90

-14-

million request is for federal funding for Medicaid expenditures, it necessarily falls within the two-year limitation statute.

The Board reasoned that "[a]mounts reported as expenditures on the QSE are those which a state asks to be charged against the FFP award" for that quarter. Id. (citing 42 C.F.R. § 430.30(c)-(d); State Medicaid Manual § 2500(A)(1). The Board found that Georgia, by reporting the $90 million request on a QSE, was representing to CMS that it was requesting FFP. Because FFP is "available only for expenditures on medical assistance or Medicaid program administration," the Board concluded that any request for FFP must relate to expenditures. Therefore, Georgia's FFP request was a claim and was made with respect to expenditures. DAB No. 2521 at 10 (citing SSA § 1903(a)(1)-(2); 42 C.F.R. § 435.1000 et seq.; 45 C.F.R. § 95.13(d)).

The Board's conclusion is bolstered by the fact that Georgia supported its request for $90 million with a schedule showing, as a prior period adjustment, the $90 million as expenditures for inpatient hospital services. AR 528.

Given that the Board's interpretation of the relevant statutes is reasonable and rationally connected to the facts, Georgia has failed to demonstrate that the Board acted

-15-

arbitrarily and capriciously when it found the $90 million request to be a claim with respect to an expenditure.

### 2.    The $90 Million Request Is Outside the Two-Year Claiming Limit

Having determined that Georgia's $90 million request was a claim with respect to expenditures, and therefore subject to the two-year limit in 42 U.S.C. § 1320b-2, the Board then evaluated whether the claim was made within two years of the expenditures. In order to do so, it needed to identify what the expenditures were that triggered application of the two-year limitation.

As noted earlier, "expenditure" is not specifically defined in the SSA. See generally 42 U.S.C. § 1396 et seq. In this context, the Board defined "expenditure" to mean "a Medicaid payment by the state to a health care provider." DAB No. 2521 at 11 (citing 45 C.F.R. 95.13(b)).

To identify the expenditures, the Board reviewed the history of the payments at issue. It explained that Georgia had timely requested and received FFP for the provider payments it made between 1988 and 2005. A large percentage of those payments were considered to be overpayments, for which Georgia had also credited back to CMS the federal share on a timely basis. According to the Board, when Georgia made the two $45 million credits, it was merely adjusting those prior claims for FFP. The

-16-

$45 million credits were not "expenditures" themselves. Similarly, the Board stated that when Georgia made its $90 million claim on the June 2009 QSE, it "was the last in a series of prior-period adjustments concerning Medicaid provider payments (expenditures)" made between 1988 and 2005. DAB No. 2521 at 13.

Having characterized the mistaken payments and the request for the $90 million refund as prior-period adjustments, the Board concluded that the "expenditures" in question were the provider payments made between 1988 and 2005. Viewing the expenditures as having taken place between 1988 and 2005, the Board concluded that Georgia's claim for $90 million on the June 2009 QSE was long past the two-year deadline and untimely.

Georgia does not directly contest the Board's determination that the "expenditures" at issue were the underlying payments to the medical providers, but instead reiterates its arguments for why its request was not a claim. Georgia also does not suggest an alternative definition or description for what the expenditures are that triggered the two-year statute of limitations.

Georgia does note that the Board's conclusion that the expenditures took place between 1988 and 2005 creates unworkable result. Georgia points out that because the Board concluded the

-17-

expenditures took place between 1988 and 2005, the two-year statutes of limitations began running between 1988 and 2005. Therefore, even if Georgia had immediately realized its $45 million mistake on the September 2005 QSE and tried to recover the $45 million on the next QSE (or even the very next day), it would have already been time barred for many of the expenditures.

Defendant's only response is that CMS may allow a state to revise a QSE to correct an error if the state discovers the error "within a short time" after submitting the QSE. Defs.' Mot. at 22. Defendants do not cite any authority for this position or define what constitutes a "short time." It appears that, under the Board's interpretation of "expenditure", a state's ability to recover erroneous credits to CMS is left completely to the discretion of CMS if the errors are in any way derivative of provider payments more than two years old.

Though the Court urges CMS to issue guidance to the states on when it will permit them to revise QSEs, so as to avoid being immediately time-barred from correcting their errors, the Court finds the Board's interpretation of the statutes and regulations to be reasonable. The Board did not act arbitrarily or capriciously when it found the expenditures underlying Georgia's request for $90 million to be the 1988-2005 medical provider

-18-

expenditures. It was also reasonable when it concluded that Georgia's $90 million request was a claim for FFP outside of the statutorily required two-year period and affirmed CMS's disallowance.

### 3. The $90 Million Request Is Not a Downward Adjustment of Overpayments

While Georgia disputes that its $90 million request constitutes a claim, it argues in the alternative that, should the request be found to constitute a claim, then the request was a downward adjustment to prior overpayment credits to CMS and therefore not subject to the two-year limitation.

As explained above in Section I.A.3, if an overpayment is made to a Medicaid provider, the state must refund the federal share of the amount overpaid to CMS within a specified period of time. Section 433.320(c) provides that if, after the state has credited the federal share to CMS, the overpayment amount is adjusted downward, then the state may reclaim the amount of the downward adjustment. For example, if it is determined that a provider was overpaid by $100, and the federal medical assistance percentage for the state is 62%, the state must refund $62 to CMS, regardless of whether it has recouped the $100 from the provider. If it is later determined that the provider was only overpaid by $75, the $100 overpayment would be

adjusted downward and the state may reclaim the relevant federal share of the $25 downward adjustment (62%, or $15.50).

Such reclaimings of downward adjustments are not subject to the two-year filing limit. 42 C.F.R. § 433.320(c). The regulation further states that the downward adjustment "is allowed only if it is properly based on the approved State plan, Federal law and regulations governing Medicaid, and the appeals resolution processes specified in State administrative policies and procedures." Id.

The bulk of Georgia's erroneous $45 million credits represented the federal share of the cumulative total of provider receivables (overpayments) going back to 1988 that had been outstanding for over 60 days, which Georgia had already refunded back to CMS. Georgia argues that the $45 million credits were "upward adjustments" to the refund amount due to the federal government, and that the $90 million request was a "downward adjustment to those same previously credited overpayment amounts." DAB No. 2521 at 17 (quoting Feb. 27, 2013 Comments of Ga. Dept. of Cty. Health on Prelim. Analysis, 8) (emphasis omitted).

The Board rejected this argument on several grounds. The first ground was that Georgia did not classify the credits as overpayment refunds on the QSEs. Id. Given that both parties

acknowledge that the $45 million credits were inadvertent, limited weight should be given to their classification on the QSE when determining the nature of the credits.

The Board's second, more persuasive, ground is that there was no "downward adjustment" (or reduction) to the amount of provider overpayments. Id. The Board reasonably defined a "downward adjustment" as "a finding or determination by a state that a provider is entitled to receive a Medicaid payment (or a portion of a Medicaid payment) that the state earlier identified as improper, excessive, or otherwise unallowable under the state plan or federal requirements." Id. In other words, because more of the provider payment is found to be permissible, the amount of the impermissible overpayment is reduced, or adjusted downward.

Although Georgia's $90 million request relates generally to overpayments (specifically, erroneously re-crediting refunds of overpayments), it is not a result of downward adjustments. The Board found no evidence that Georgia determined that any of the overpayments to providers, which were previously refunded to CMS, "were in fact allowable under the state plan and federal requirements." Id. at 18. That is to say, the amounts determined to have been overpayments have not changed, and therefore there is no downward adjustment.

Section 433.320(c) addresses disputes to overpayment determinations, the resolution of which may take longer than two years, and provides an exception to the two-year limit in circumstances where the overpayment amount is adjusted downward. The Court agrees with the Board that there is nothing to indicate that the two-year limit exception in section 433.320(c)(2) was intended to be so expansive as to include every transaction that relates to overpayments. The Board correctly held that the two-year exception only applies to downward adjustments, as defined as a reclaiming of refunded amounts due to a determination that the overpayment itself was reduced. Georgia's attempt to reclaim what it overpaid to CMS did not involve a reduction in overpayments to medical providers. Therefore, there was no "downward adjustment" of overpayments as defined by § 433.320.

The Board's finding that Georgia's request was not a downward adjustment and therefore not exempt from the two-year filing was not arbitrary, capricious, or an abuse of discretion.

-22-

### B.   Equitable Claims

In addition to its statutory claim, Georgia makes equitable claims for money had and received and unjust enrichment.   While Georgia asked the Board to consider equitable principles when interpreting the two-year limit, it brought no equitable claims before the Board.     Therefore, the Court evaluates Georgia's equitable claims de novo.

#### 1.   Adequate Legal Remedy

Before the Court may consider equitable remedies, Georgia must show that it did not have an adequate remedy at law. "It is a basic doctrine of equality jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law . . . ." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992). Defendants argue that the statute and its Regulations provide an adequate remedy at law, and "therefore no resort to equitable remedies is necessary." CMS Mot. at 3.

The mere existence of a remedy at law is not sufficient to warrant denial of equitable relief. See Council of & for the Blind of Delaware Cnty. Valley, Inc. v. Regan, 709 F.2d 1521, 1550 n.76 (D.C. Cir. 1983); Interstate Cigar Co. v. United States, 928 F.2d 221, 223 (7th Cir. 1991). The legal remedy, both in respect to the final relief and the mode of obtaining

it, must be "as efficient as the remedy which equity would afford under the same circumstances." Regan, 709 F.2d at 1550, n.76 (citing Gormley v. Clark, 134 U.S. 338, 349 (1890)). Therefore, the Court must evaluate whether Georgia's legal remedy in this situation is adequate.

The Board's interpretation of the facts and regulations renders any attempt by Georgia to recover a portion of the erroneous credits time-barred the moment it made the mistaken credits. Under the Board's interpretation, requests to recover erroneous credits to CMS are prior-period adjustments and are evaluated for purposes of the two-year limitation based on the underlying expenditure. Therefore, any erroneous credits that relate to expenditures that occurred more than two years prior are time-barred the moment the erroneous credit is made.

Defendants counter that simply because relief is time-barred does not make a remedy inadequate. Defs.' Mot. at 31. The Court agrees as a general matter that equitable remedies are not meant to be used as an end-run around statutes of limitation. However, in the case at hand, there was literally no time window in which Georgia could have sought to recover a portion of the erroneous credits. For another portion of the credits, the limitations period was, in practice, less than the two years contemplated by the statute.

-24-

When a claim is effectively time-barred the moment it arises, it cannot be said that the legal remedy is "adequate to meet the ends of justice." Regan, 709 F.2d 1550, n.76 (internal citation and quotation omitted). Similarly, there is no adequate remedy at law when the two-year period provided by Congress is truncated, as it was for many of the expenditures that had taken place less than two years before the mistaken credits were made. Therefore, the Court finds that there is no adequate remedy at law available for Georgia that prevents the Court from considering equitable remedies.

### 2.   Unjust Enrichment

Georgia's claims for unjust enrichment and money had and received rely on the same principles of restitution, namely that a "person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1. Though the remedies are similar and the parties conflate their arguments for each at times, they will be addressed separately.

Recovery under a theory of unjust enrichment requires a showing that "a person retains a benefit . . . which in justice and equity belongs to another." United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co., 81 F.3d 240 (D.C. Cir. 1996). Plaintiff's claim fits squarely within this definition.

-25-

Measured against many metrics, Georgia is not considered a wealthy state. Approximately 18.2% of Georgia's population lives in poverty, giving it the undesirable distinction of having the eighth highest poverty level in the 50 United States. See U.S. Census Bureau 2009-2013 American Community Survey 5-Year Estimates [hereinafter "ACS Estimates"]. The estimated median household income for the state is $49,179. With regard to personal income per capita, Georgia again has the undesirable distinction of ranking 40th out of all 50 states. Id.; Bureau of Economic Analysis, State Personal Income 2013 (Mar. 25, 2014). It was projected that Georgia would spend $2.85 billion on Medicaid and PeachCare[4] in 2017, or approximately 15.57% of the state's revenue. See DCH Presentation to 2013 Joint Study Committee on Medicaid Reform, 11 (Aug. 28, 2013) [hereinafter "DCH Presentation"].

The loss of $90 million in credits due to the mistakes of one Georgia employee,[5] Georgia Mot. at 14-15, will harm hundreds of thousands of Georgia's most vulnerable citizens. The population of the State of Georgia is roughly 9.8 million, and approximately 1.89 million of those people were enrolled in

---

[4]   PeachCare is Georgia's Children's Health Insurance Program.

[5]   Georgia refers several times to "a State employee" and does not mention the involvement of any other employees.

Medicaid in 2013.  See ACS Estimates; DCH Presentation at 11.
Put in perspective, close to 20% of Georgia's population is
enrolled in Medicaid.  These are the people who will be hurt the
most by Georgia's administrative errors and the subsequent
crediting of $90 million of Georgia's Medicaid credits to CMS.
It is Georgia's poor, elderly, disabled, and pregnant
populations that will suffer the most should these
administrative errors stand uncorrected.

Defendants do not claim that CMS is entitled to the $90
million in credits, but rather that Georgia is precluded from
recovering the credits.

Defendants argue that Georgia's negligence in failing to
timely file its claim for the return of the $90 million in
credits is relevant to the evaluation of its unjust enrichment
claim because the "good cause" exception to the two-year filing
limit explicitly states that neglect and administrative
inadequacies do not constitute good cause.  See Defs.' Mot.
at 34.

First, the Court has already determined that the relevant
statutes and regulations do not provide an adequate remedy at
law, and therefore the Court's unjust enrichment analysis is not
bound by their contours, including the good cause exception.

-27-

Second, Defendants' argument focuses on the incompetence of Georgia in failing to file for the return of the $90 million in credits within the two year statute of limitations. However, as discussed previously, under the Board's interpretation, the statute of limitations had already run for a portion of those expenditures the moment Georgia established each of the inadvertent $45 million credits.

While it is not disputed that Georgia was at fault in making the two $45 million payments in the first place, that fact is of limited relevance. In cases where a benefit is conferred by mistake, "the fact that the claimant may have acted negligently in making a mistaken payment is normally irrelevant to the [unjust enrichment] claim." Restatement (Third) of Restitution and Unjust Enrichment § 6 cmt. a (2011).

Defendants contend that Georgia's claim that the erroneous credits "resulted in unjust enrichment fails because CMS has not been any more unjustly enriched than it would have been had Georgia failed to claim the $90 million in expenditures within the two-year limit." Defs.' Mot. at 32-33.  The two situations are totally different and therefore not comparable.

In the case of time-barred reimbursements for expenditures, a state would have had to have failed to make any timely filing for the expenditures. Here, Georgia did timely file for

-28-

reimbursement for all the expenditures, only to, years later, inadvertently refund to CMS a portion of the reimbursements. In addition, the statutes and regulations clearly provide for how a state can and must seek reimbursement for expenditures. Significantly, there is no comparable guidance for recovering mistaken payments.

The foundation of Georgia's unjust enrichment claim is that the credits are in essence the equivalent of money rightfully belonging to the State and should never have been given to CMS. While it is not disputed that Georgia is in its current position as a result of the very egregious errors it made, that does not change the fact that CMS is now in possession of $90 million of Georgia's credits to which it is not entitled.

While the Court does not lose sight of the fact that Georgia's predicament is one of its own making, it also bears in mind the distressing financial environment Georgia Medicaid faced that led to the $90 million in erroneous credits. The bulk of the $90 million was the result of Georgia making advance payments to its providers in 2003-2005 who were threatening to stop treating their Medicaid patients unless they were paid. Moreover, with CMS's knowledge, and its approval, Georgia began making advance payments to Medicaid providers (a practice not normally permitted). DAB No. 2521 at 6. This "required complex

reconciliation of advance payments to providers with actual claims" and greatly inflated Georgia's provider receivables. Georgia Reply at 18.

In this uncharted territory, Georgia was trying to comply with CMS's provider overpayment regulations, as well as accurately represent the situation in the State's internal financial statements. Id.

Taking into account all these considerations, the Court concludes that the balance of equities weighs in favor of Georgia and that Defendants have been unjustly enriched by Georgia's crediting of $90 million to CMS. CMS does not even claim, nor has it shown, that the $90 million in credits rightfully belongs to it. While the Court recognizes the importance of timeliness and CMS's ability to plan its budget, as well as Georgia's role in causing the mistake, the reality is that the credits are Georgia's and the United States Government would be unjustly enriched if permitted to keep them. Georgia's ineptitude in making errors and delay in discovering them is confounding, but does not justify permitting the federal government keeping the $90 million in credits to the detriment of Georgia's 1.89 million Medicaid recipients.

Because Georgia prevails on its claim for unjust enrichment, the Court need not address its second claim of money had and received.

## IV.   CONCLUSION

For all of the foregoing reasons, Georgia's Motion shall be **granted** and Defendants' Cross Motion shall be **denied.**   An Order shall accompany this Memorandum Opinion.

February 10, 2015

*Gladys Kessler*
Gladys Kessler
United States District Judge

**Copies via ECF to all counsel of record**

–31–